KENNITH GASKIN, Plaintiff-Appellant and Cross-Appellee, v. MICHAEL GOLDWASSER *et al.*, Defendants-Appellees and Cross-Appellants.

Fourth District No. 4—87—0017

Opinion filed March 1, 1988.

998

Bernard A. Puglisi, of Champaign-Urbana Legal Clinic, P.C., of Champaign (Edwin Zinman, of San Francisco, California, of counsel), for appellant.

John B. Hensley, of Dobbins, Fraker, Tennant, Joy & Perlstein, of Champaign, for appellees.

JUSTICE McCULLOUGH delivered the opinion of the court:

On August 13, 1985, the plaintiff, Kennith Gaskin, brought suit in the circuit court of Champaign County, alleging dental malpractice. On September 1, 1981, the defendant, Dr. Goldwasser, extracted the 19 teeth remaining in the plaintiff's mouth. Defendant admitted that 5 of the 19 teeth were removed without the consent of the plaintiff. The plaintiff sought recovery on theories of negligence, wilful and wanton misconduct, battery, informed consent, and fraud.

The jury returned a verdict of $25,000 in damages for extraction of the five lower teeth. The jury also found in favor of the plaintiff for extraction of the 14 teeth and awarded damages in the amount of $3,000 for present and future expenses. Following denial of all post-trial motions, the plaintiff appeals and the defendants cross-appeal the order of the circuit court.

We reverse and remand for a new trial.

On August 7, 1987, the plaintiff filed with this court an application to amend the pleadings pursuant to Supreme Court Rule 362.

(107 Ill. 2d R. 362.) In the application, the plaintiff seeks to amend the complaint adding count VI (informed consent-negligence later amended to informed consent-wilful and wanton misconduct), which was previously dismissed by the circuit court. While we note the jury verdict, finding liability for the removal of the 14 teeth, warrants amendment of the pleadings to conform to the proof of the case, our disposition renders the issue moot. Upon retrial, plaintiff will be allowed to properly replead his case, consistent with our decision in this cause.

The parties raise numerous issues on appeal specifically finding error with the trial court for: (1) denying plaintiff's motion for a new trial on the issue of damages; (2) directing a verdict against plaintiff on counts V and the punitive damages portion of count VIII; (3) dismissing plaintiff's claim of battery; (4) dismissal of both versions of count VI; (5) denial of plaintiff's motion for summary judgment on counts V and VIII; (6) denying plaintiff's motion for attorney fees and expenses; (7) disallowing plaintiff's expert evidence regarding the cost of dentures; (8) disallowing testimony of plaintiff's conversations with his general dentists; (9) denying defendant's motion for judgment notwithstanding the verdict; (10) disallowing testimony regarding the cost of alternative treatment; (11) allowing previous testimony of defendant for impeachment purposes; and (12) improperly instructing the jury.

BACKGROUND

On August 13, 1985, plaintiff filed a complaint against defendants alleging dental malpractice. The case had been previously filed and voluntarily dismissed by the plaintiff after an unfavorable ruling regarding admissibility of plaintiff's expert testimony.

The complaint was amended numerous times and in final form included the following 10 counts: count I against Carle Clinic Association (Clinic) alleging negligence for removing the five lower teeth; count II against defendant Clinic alleging negligence on *res ipsa loquitur* theory for removing the five teeth; count III against the defendant, Dr. Michael Goldwasser, D.D.S., for removing the five teeth; count IV against Dr. Goldwasser alleging negligence on a *res ipsa loquitur* theory for removing the five teeth; count V against Dr. Goldwasser on a wilful and wanton misconduct theory for removing the five teeth; count VI against Dr. Goldwasser on an informed consent-negligence theory for removing the 14 teeth; count VI (misnumbered-second version) against Dr. Goldwasser on an informed consent-wilful and wanton misconduct theory for removing the 14 teeth; count

VII against Dr. Goldwasser alleging battery for the removal of the five teeth; count VIII against Dr. Goldwasser on an informed consent-battery theory for removing the 14 teeth; and count IX against Dr. Goldwasser on a fraud-misrepresentation theory for the removal of the five teeth.

On December 3, 1985, the circuit court dismissed counts VII and IX with prejudice. Both versions of count VI were dismissed and the first version alleging negligence-informed consent was refiled on December 24, 1985. That count was dismissed on February 5, 1986, and refiled again on February 26, 1986. That count was again dismissed on April 30, 1986. The plaintiff did not refile the second version of count VI (informed consent-wilful wanton misconduct).

During trial, the court withdrew from consideration any issue of punitive damages based on wilful and wanton misconduct thereby eliminating count V and the punitive portion of count VIII. Plaintiff's motion for a directed verdict on all counts at the close of plaintiff's case was denied. The defendants' motion for a directed verdict was also denied. At the close of the defendants' case, the court allowed the plaintiff's motion to withdraw from consideration any issue regarding plaintiff's contributory negligence. The court directed a verdict on counts I and III alleging negligence for removal of the five lower teeth. Consequently, the issue of liability and damages for removal of the 14 teeth and damages for removal of the five teeth went to the jury.

PLAINTIFF'S CASE

Plaintiff initially called Dr. Goldwasser as an adverse witness. Dr. Goldwasser is a board-certified oral surgeon employed by the Carle Clinic Association in Champaign. Dr. Goldwasser explained his educational background and experience. The general goal of dentistry as reiterated by Dr. Goldwasser is to preserve and maintain oral health. The extraction of teeth is viewed as a last resort.

■■ ■ The standard of care applicable to oral surgeons is a national standard. The standard is to act in the best interests of the patient. Additionally, it is the duty of the dentist to inform the patient of options for alternative treatment, as well as explain the risks and benefits of the chosen procedure. Prior to extracting teeth, an oral surgeon is required to make an independent determination based upon a visual examination and X rays.

The plaintiff first saw Dr. Goldwasser on August 27, 1981. The plaintiff was referred to Dr. Goldwasser by Dr. Norman James, the plaintiff's general dentist. At the time of the first visit, the plaintiff

had 19 teeth remaining; 8 upper teeth and 11 lower teeth.

During the initial consultation, Dr. Goldwasser prepared dental records indicating plaintiff's decision to have 14 teeth extracted. Although plaintiff initially indicated a desire to have all teeth extracted, he subsequently decided upon the advice of Dr. James to keep five teeth to anchor a partial lower denture. Dr. Goldwasser made a visual examination of plaintiff's mouth using a mirror and tongue depressor. He further consulted X rays which had been forwarded to him by Dr. James. Dr. Goldwasser did not discuss the plaintiff's dental condition or suggest alternative treatment procedures.

Dr. Goldwasser admitted that he did not use a calibrated periodontal probe to determine the amount of bone loss or extent of periodontal disease. Such an instrument is used by dentists (usually periodontists who specialize in gum disease) to probe underneath the gum to determine how tight the gums fit up against the teeth. The extent of periodontal disease, if any, is an important consideration in determining whether or not to extract teeth. Although Dr. Goldwasser failed to utilize a probe, it was his determination, based upon his clinical examination and X rays, that plaintiff had chronic bone loss (20% to 30%). However, on cross-examination Dr. Goldwasser did admit that 30% bone loss does not necessarily mandate extraction of teeth. It was also Dr. Goldwasser's opinion the majority of the plaintiff's teeth would have required root canal treatment and extensive restorative dentistry to be saved.

Records from Dr. Goldwasser further indicated that the only risk of surgery discussed with plaintiff was the possibility of infection. The doctor noted, however, that he would not necessarily have expressly noted reasonable alternatives discussed. If he had recommended that plaintiff try to save all of his teeth, however, it would have been an important consideration warranting documentation. The doctor did not recall at trial whether pus had been present in plaintiff's mouth in 1981 which would have indicated extensive infection. Again, however, Dr. Goldwasser indicated that he would not necessarily have charted it. Notations made by Dr. Goldwasser's nurse showed plaintiff's desire was to have all of his remaining teeth extracted. This fact was corroborated by Dr. Goldwasser, who stated that when he initially consulted with the plaintiff, he indicated "I want my teeth removed."

After the initial consultation, plaintiff returned to Dr. Goldwasser on September 9, 1981, for the surgical extraction. Dr. Goldwasser did not review the plaintiff's charts prior to the surgery. As a result, during the course of surgery that day, five teeth were extracted without the plaintiff's consent. Dr. Goldwasser noted that the surgery was

otherwise uneventful with no complications. Dr. Goldwasser was first made aware of his mistake when the patient returned to his office on the day after surgery.

Dr. Goldwasser admitted this conduct deviated from the standard of care. Dr. Goldwasser, however, maintained that he acted within the standard of care in extracting the 14 teeth to which the plaintiff consented.

The plaintiff testified that throughout his life he only consulted dentists when in pain or experiencing severe dental problems. At the age of 16, the plaintiff was hit in the mouth with a roller skate resulting in four broken teeth. The plaintiff, however, waited over two years before seeking any dental attention. When the plaintiff finally sought attention, his dental condition warranted the extraction of 10 teeth.

In 1970, the plaintiff consulted Dr. Jordan, due to severe pain. Dr. Jordan examined the plaintiff's mouth and found extensive decay and periodontal disease, and as a result, extracted 10 teeth. The plaintiff did not replace the missing teeth. Over two years later, plaintiff received a partial plate to replace the missing teeth while in the Army. The plate, however, reduced the plaintiff's biting power and caused him pain and discomfort. As a result, the plate had to be adjusted by Army dentists, and following military discharge, by Dr. Eisenberg. The plaintiff admitted that he brushed his teeth approximately every other day despite dental instructions and a dental control program he underwent which taught him otherwise.

In March 1981, the plaintiff consulted Dr. James. At that time, plaintiff only had 19 of his natural teeth remaining. The plaintiff admitted that he had not worn his partial denture for four or five weeks because he had broken it. Instead of seeking dental attention, the plaintiff attempted, without success, to glue the partial back together himself. Following examination by Dr. James, the plaintiff was referred to Dr. Goldwasser for extraction of all but five teeth. Notwithstanding Dr. James' referral made on March 24, 1981, the plaintiff did not go to see Dr. Goldwasser for over five months. During the interim, the plaintiff experienced severe pain and infection in his mouth. Eventually, the plaintiff went to the emergency room at Burnham Hospital to remedy the problem. At the hospital, plaintiff was examined by Dr. Basler, a medical doctor. The doctor prescribed medication for the infection in plaintiff's mouth and told plaintiff to see a dentist immediately.

Prior to surgery, Dr. Goldwasser consulted with the plaintiff regarding anesthesia, the surgical procedures, and explained that blood

work and a chest X ray would be required before surgery. Plaintiff maintained that he did not discuss the condition of his teeth with Dr. Goldwasser. The plaintiff claimed that before seeing Dr. James, he did not want all of his teeth removed, and prior to surgery was not given any information about keeping his teeth, except for the five bottom ones. The plaintiff did admit, however, that he made no indication that he wanted to save his remaining 19 teeth.

Following the extraction and implementation of dentures, the plaintiff continued his prior pattern of dental care. The plaintiff did not consult a dentist in 1982, 1983, or 1984. In 1985, the plaintiff consulted Dr. Norman for a denture adjustment.

Plaintiff explained in great detail the problems he continues to experience with his dentures. Specifically, the plaintiff maintains that he can no longer chew or bite food as he was able to do with his natural teeth. There are certain foods plaintiff is no longer able to eat. The plaintiff complains of continuing problems with denture sores. Additionally, the plaintiff experiences problems with his dentures slipping that affect his ability to speak, eat, and kiss his wife. Plaintiff maintains he was told nothing about the problems of wearing dentures prior to the extraction of his teeth.

Dr. Philip Norman, a dentist in Urbana, Illinois, who specializes in endodontics, testified on behalf of the plaintiff. Endodontics involves the specialization of root canals and procedures to save teeth. On March 28, 1985, Dr. Norman examined the plaintiff. The plaintiff went to Dr. Norman because of problems with wearing his dentures. Dr. Norman made adjustments to the plaintiff's dentures and instructed plaintiff on learning to wear dentures. Dr. Norman explained the common complications of wearing dentures and the remedies for such problems. He saw numerous sore spots on the plaintiff's gums which are a common occurrence for denture wearers. When asked to give an opinion regarding the cost for a new set of dentures, Dr. Norman testified as to his charges. Dr. Norman, however, could not give testimony regarding the usual and customary fee for dentures.

Dr. Stanley Margul, an oral and maxillofacial surgeon, from Quincy, Illinois, opined that Dr. Goldwasser deviated from the standard of care. Dr. Margul claimed that Dr. Goldwasser's clinical examination, discussion of alternative treatments, and dental history taking were inadequate. It was Dr. Margul's opinion that most, if not all, of plaintiff's teeth could have been salvaged by root canal treatment and other restorative dental techniques.

Dr. Margul further testified that full-denture wearers may experience resorption of the lower jawbone. Resorption occurs from the

dentures rubbing up against the jawbone and eventually requires corrective surgery. Dr. Margul testified that plaintiff might someday require ridge augmentation surgery to correct such a problem. Dr. Margul admitted, however, that at this point in time such a statement is very speculative. Dr. Margul further testified as to the standard of care among dentists, specifically oral surgeons. He claimed that before deciding to extract a tooth, the oral surgeon should clinically examine it, X-ray it, and examine the amount of bone loss or gum disease by using a periodontal probe.

Dr. Margul testified that the X rays and dental history indicated the plaintiff's oral and dental health were quite poor.

On cross-examination, Dr. Margul admitted that dentists do not always agree on the interpretations of X rays. He further stated that he did not read the depositions of all of the plaintiff's previous dentists. Dr. Margul did not examine the plaintiff's teeth prior to extraction. Consequently, he was unaware of the extent of periodontal disease.

DEFENDANTS' CASE

Defendants presented the evidence depositions of Dr. Jack Jordan and Dr. Harry Eisenberg, treating dentists of the plaintiff. Dr. Jordan first treated plaintiff in December 1970 when the plaintiff was 19 years old. At that time, the plaintiff had 30 of his 32 natural teeth. The plaintiff initially consulted Dr. Jordan due to extensive dental pain. Dr. Jordan diagnosed the plaintiff as having extensive dental caries and Vincent's infection, commonly referred to as "trench mouth" (*i.e.*, necrotizing ulcerative gingivitis). Plaintiff also had multiple decayed teeth which were broken down beyond repair. Dr. Jordan opined that the plaintiff's dental condition was attributable to his poor oral hygiene.

Dr. Jordan extracted 10 of the plaintiff's teeth in December 1970, due to the extensive decay. Jordan claimed that a clinical examination reveals whether or not a patient practices good oral hygiene and poor oral hygiene plays a prominent role in the development of tooth decay.

Dr. Eisenberg first saw the plaintiff in 1974. At that time, the plaintiff had periodontal infection and dental caries. The plaintiff was instructed on home care and prescribed medication for the infection. The plaintiff returned in 1974 for cleaning and X rays. Following eight appointments in 1974, the plaintiff discontinued treatment completely without explanation. Dr. Eisenberg indicated that he was surprised by plaintiff's failure to return as the plaintiff required further dental attention. Plaintiff did return to Dr. Eisenberg in 1976. At that

time, the plaintiff was experiencing problems with his partial, which was subsequently repaired. After two appointments in 1976, the plaintiff cancelled a third appointment without explanation. Eisenberg last saw the plaintiff in April 1979 when he extracted a tooth.

Dr. Norman James, a general dentist in Urbana, Illinois, testified that he first saw the plaintiff on March 24, 1981. The plaintiff told Dr. James that he desired to have all of his teeth removed and a full set of dentures. Dr. James stated, "The patient was very vehemently for getting rid of all of his teeth, all of his remaining teeth." Dr. James informed the plaintiff that some of his teeth could be saved, explaining that he should keep five remaining teeth to anchor a partial on the lower half of his mouth.

After further discussion, Dr. James convinced the plaintiff to keep five lower teeth to anchor a partial. During the course of the discussion, however, the plaintiff continued to assert that he had enough dental problems and wanted to get rid of his teeth and to get dentures.

Dr. James explained the consequences of wearing dentures and specifically told the plaintiff that they "would never be as good as his own teeth." Dr. James described the plaintiff's teeth as severely broken down and poorly maintained with much decay, some abscesses, and inflamed gums. Dr. James indicated that this condition was the result of plaintiff's dental neglect.

The plaintiff returned to Dr. James after the extraction of his teeth. During consultations, following the extractions, Dr. James adjusted the dentures and instructed the plaintiff on the care of his dentures. The doctor further told plaintiff to contact him should he experience any problems with the dentures or his gums. Dr. James never heard from the plaintiff again.

The final witness for the defense was Dr. Clifford Brown, an oral and maxillofacial surgeon from Peoria, Illinois. Dr. Brown testified that he reviewed the plaintiff's records, X rays, and depositions. Dr. Brown testified that the removal of the five bottom teeth without consent of the plaintiff was a deviation from the standard of care. Dr. Brown further stated that attempting to save all of the plaintiff's 19 teeth might have been an alternative, but not necessarily a reasonable one.

He testified that a reasonably qualified, experienced oral surgeon would not have recommended to the plaintiff that he try and save all of his 19 teeth. He based that opinion on the condition of the plaintiff's mouth, the plaintiff's past dental history, plaintiff's attitude and desire, and a professional judgment about what would be in the plain-

tiff's best interests. It was Dr. Brown's opinion that Dr. Goldwasser did not deviate from the standard of care in the conduct of his clinical examination and study of Dr. James' X rays. Dr. Goldwasser acted reasonably in concurring in Dr. James' recommendation to extract 14 of the 19 teeth. Dr. Goldwasser further did not deviate from the standard of care by not referring plaintiff to a periodontist or endodontist and not by using a periodontal probe due to the advanced dental caries and extensive periodontal disease involved.

It was Dr. Brown's opinion that Dr. Goldwasser obtained sufficient information prior to performing the extraction. It was not a deviation from the standard of care for an oral surgeon not to discuss the advantages or disadvantages of dentures with the plaintiff, especially since the plaintiff had been referred to him by a general dentist. Dr. Brown further indicated that, based upon the plaintiff's history and condition of his mouth, Dr. James' recommendation was appropriate.

In rebuttal, the plaintiff testified that had he been presented with alternative treatment procedures, he might not have proceeded with the extraction of his remaining teeth.

On June 6, 1986, the defendants filed a motion for leave to file the affirmative defense of contributory negligence. The defense asserted that "any damages sustained by plaintiff, as alleged, were proximately caused in whole or in part, by his failure to exercise due care for the health of his teeth and mouth, which proximately caused tooth and gum disease and the progressive aggravation thereof." The plaintiff filed numerous objections to the affirmative defense. The court, however, allowed defendant's defense to stand throughout trial.

At the close of all evidence, the plaintiff presented a motion in chambers to withdraw from consideration by the jury any issue relating to the plaintiff's contributory negligence. The court found that the defendant had failed to meet its burden of proof with respect to proximate cause in proving contributory negligence. Consequently, the court granted the plaintiff's motion. The court did, however, note that the condition of the teeth extracted was relevant to the amount of loss actually sustained.

At the instructions conference, the plaintiff tendered his proposed instruction No. 10, which read:

"The defendants in this case have contended that certain acts or omissions on the part of the plaintiff constitute a failure of the plaintiff to use ordinary care for his own safety. The failure of a plaintiff to use ordinary care for his own safety is known as contributory negligence.

However, the court has ruled that the plaintiff's contributory negligence, if any, does not bar or reduce his recovery in any way, and that any alleged comparative negligence on the plaintiff's part is not an issue in this case and should not be considered by you in any way."

Plaintiff also tendered proposed instruction No. 34:

"With respect to the issue of damages for teeth Nos. 20, 21, 22, 27, and 28 and with respect to the issue of liability and damages on informed consent as to the removal of teeth Nos. 2, 3, 4, 5, 6, 13, 14, 15, 17, 23, 24, 25, 26, and 32 you must disregard any alleged contributory negligence on the part of plaintiff that you have heard in this case."

The defendant objected to the proposed instructions and the court sustained the objections, thereby refusing the tendered instructions. The court specifically noted that, in light of its previous ruling, the issue of contributory negligence was not before the jury.

■ The purpose of jury instructions is to convey to the jurors the correct principles of law applicable to the evidence which has been submitted to them. (*Fravel v. Morenz* (1986), 151 Ill. App. 3d 42, 502 N.E.2d 480.) Consequently, the instructions given must state the law fairly and distinctly and not mislead the jury or prejudice a party. *Fravel*, 151 Ill. App. 3d 42, 502 N.E.2d 480.

■ A litigant is entitled to have the jury instructed on the issues presented, the legal principles to be applied, and the facts that must be proved to support a verdict. (*Friedman v. Park District of Highland Park* (1986), 151 Ill. App. 3d 374, 502 N.E.2d 826; *Ralston v. Plogger* (1985), 132 Ill. App. 3d 90, 476 N.E.2d 1378.) An instruction is justified if it is supported by some evidence in the record. (*Friedman*, 151 Ill. App. 3d 374, 502 N.E.2d 826; *Ralston*, 132 Ill. App. 3d 90, 476 N.E.2d 1378.) The trial court has discretion in determining which instructions to give and the form of the instructions given. *Ralston*, 132 Ill. App. 3d 90, 476 N.E.2d 1378.

Throughout trial, the defendants presented extensive evidence of the plaintiff's lack of oral hygiene. The court allowed defendants' affirmative defense of contributory negligence to stand until the close of all evidence, at which time the court found the defendants failed to sustain their burden of proof. The court's ruling dismissing defendants' affirmative defense was properly made outside the presence of the jury. The jury, however, was never instructed regarding the proper use of this prejudicial evidence or admonished in any respect about the effect of plaintiff's behavior upon his recovery. There is no question that the quantity and quality of the evidence presented was

highly prejudicial.

■ Where prejudicial evidence having a tendency to mislead the jury is admitted, the jury should be concisely advised to consider such evidence for a limited purpose. (See *Fedt v. Oak Lawn Lodge, Inc.* (1985), 132 Ill. App. 3d 1061, 478 N.E.2d 469.) Although we do not agree with the specific instructions tendered by the plaintiff, the jury should have been instructed regarding the limited purpose for which the evidence of the plaintiff's poor oral hygiene was admitted.

The plaintiff places great weight upon the case of *Owens v. Stokoe* (1986), 115 Ill. 2d 177, 503 N.E.2d 251, for the proposition that the trial court improperly allowed any evidence regarding the plaintiff's poor oral hygiene practices.

In *Owens*, the plaintiff brought suit against his oral surgeon for nerve damage sustained as a result of surgical removal of tumors in his mouth. At trial, the defendants requested and obtained a jury instruction regarding the contributory fault of the plaintiff arising out of: the failure to obtain a second opinion; prior poor oral hygiene, and the alleged refusal of plaintiff to allow X rays to be taken. The supreme court found that the trial court erred in instructing the jury on contributory negligence and in placing the issue of comparative negligence before the jury. Evidence adduced failed to show the plaintiff's negligence was a "proximate cause" of his injury. As a result, the court found the plaintiff's award could not be reduced under a theory of contributory negligence. *Owens*, 115 Ill. 2d at 183, 503 N.E.2d at 254.

■ As in *Owens*, there was insufficient evidence to support defendants' allegations of contributory evidence. However, evidence of the plaintiff's dental condition before and after surgery was properly admissible to show the nature and extent of the plaintiff's present condition. (See *Shaheed v. Chicago Transit Authority* (1985), 137 Ill. App. 3d 352, 484 N.E.2d 542; *Intrater v. Thomas* (1977), 54 Ill. App. 3d 709, 369 N.E.2d 1339.) It was argued that the plaintiff began his course of treatment with Dr. Goldwasser with "Chevrolet teeth" as opposed to "Cadillac teeth." This was a valid consideration in fixing the amount of damages sustained. The jury, however, should have been instructed in this respect.

At the close of all evidence, defendants moved for withdrawal of all punitive counts alleged, those being count V alleging wilful and wanton misconduct for removal of the five lower teeth, and count VIII alleging lack of informed consent-battery. The court granted defendants' motion finding that "there was not such a deviation from the consent given as to constitute battery as a matter of law in Illi-

nois."

The plaintiff asserts that this ruling was an abuse of discretion as the conduct of defendants was analogous to unnecessary surgery which clearly evidenced a reckless disregard for the safety of the plaintiff. According to the plaintiff, defendants' cumulative conduct of failing to make a complete diagnosis and failing to explain treatment alternatives exceeds mere negligence rising to the level of wilful and wanton misconduct.

■ Wilful and wanton conduct has been defined as an intentional act or one committed under circumstances which exhibit a reckless disregard for the safety of others. (*O'Brien v. Township High School District 214* (1980), 83 Ill. 2d 462, 469, 415 N.E.2d 1015, 1018, quoting *Lynch v. Board of Education* (1980), 82 Ill. 2d 415, 429, 412 N.E.2d 447, 457.) Such conduct includes the failure to exercise ordinary care in preventing conduct after gaining knowledge of an impending danger or the failure to discover the danger through recklessness or carelessness when it could have been discovered by ordinary care. *O'Brien*, 83 Ill. 2d at 469, 415 N.E.2d at 1018, quoting *Lynch*, 82 Ill. 2d at 429, 412 N.E.2d at 447.

■ Evidence indicated that Dr. Goldwasser failed to review the plaintiff's chart prior to surgery. He admitted this conduct constituted a deviation from the established standard of care. Every other expert that testified concurred that the unauthorized removal of the five lower teeth was conduct in contradiction of the standards of the profession. The conduct does indicate a reckless disregard for the plaintiff's well-being. "Recklessness" in the context of wilful and wanton misconduct includes actions which are still negligent, but to a higher degree of carelessness. (*Robb v. Sutton* (1986), 147 Ill. App. 3d 710, 498 N.E.2d 267.) Recklessness need not involve an actual intent to do harm. (*Robb*, 147 Ill. App. 3d 710, 498 N.E.2d 267.) Since the conduct of Dr. Goldwasser was a clear disregard of plaintiff's oral health, the issue of wilful and wanton misconduct should have gone to the jury with respect to the removal of the five teeth. With respect to count VIII, which alleged lack of informed consent-battery, removal of the 14 teeth, the trial court's ruling was not an abuse of discretion. Our disposition as to count VII is helpful in this regard.

In count VII of the complaint, the plaintiff alleged that Dr. Goldwasser committed battery by removing the five lower teeth without consent. Plaintiff sought both compensatory and punitive damages for injuries sustained as a result. On December 3, 1985, the trial court granted defendants' motion to dismiss count VII with prejudice.

■ A battery is defined as the unauthorized touching of the per-

son of another. To be liable for battery, the defendant must have done some affirmative act intended to cause an unpermitted contact. (*Mink v. University of Chicago* (N.D. Ill. 1978), 460 F. Supp. 713, 717.) " 'The gist of the action for battery is not the hostile intent of the defendant, but rather the absence of consent to the contact on the part of the plaintiff.' " *Mink*, 460 F. Supp. at 718, quoting W. Prosser, Law of Torts, §9, at 35 (4th ed. 1971).

 ██ Under Illinois law, claims alleging a total lack of consent to medical procedures are treated as batteries because they involve an intentional unauthorized touching of the person of another. (*Lojuk v. Quandt* (7th Cir. 1983), 706 F.2d 1456, *cert. denied* (1986), 474 U.S. 1067, 88 L. Ed. 2d 795, 106 S. Ct. 822.) Recovery under a battery theory in medical malpractice cases is also allowed where " 'the treatment is either against the patient's will or *substantially at variance* with the consent given.' " (Emphasis added.) (*Woolley v. Henderson* (Me. 1980), 418 A.2d 1123, 1133, quoting *Downer v. Villeux* (Me. 1974), 322 A.2d 82, 89-90; see also *Cobbs v. Grant* (1972), 8 Cal. 3d 229, 502 P.2d 1, 104 Cal. Rptr. 505; *Perin v. Hayne* (Iowa 1973), 210 N.W.2d 609.) In *Mink*, the District Court for the Northern District of Illinois observed: the scope of the patient's consent is crucial to their ultimate recovery in a battery action. The defendants' privilege is limited at least to acts *substantially similar* to those to which the plaintiffs consented. If the defendants went beyond the consent given, to perform substantially different acts, they will be liable under a theory of battery. *Mink*, 460 F. Supp. at 718.

 The removal of the five lower teeth was without consent. Furthermore, the removal of five additional teeth was not an act which was substantially similar to the consent given. There was sufficient evidence to support a battery theory of recovery.

 As to count VIII, the evidence showed there was not a total lack of consent in removal of the 14 teeth. The defendant's acts were substantially similar to which plaintiff consented, when considered in the context of whether a battery was committed. The trial court was correct in granting defendant's motion as to count VIII, that the actions of defendant were not such a deviation from the consent given as to constitute battery, as a matter of law. *Mink*, 460 F. Supp. at 718.

The plaintiff's fourth allegation upon review involves the dismissal of count VI alleging negligence-informed consent and wilful and wanton misconduct-informed consent. Since the substance of this argument was addressed in our disposition of plaintiff's motion taken with this case, we see no need to belabor the point.

■■ Plaintiff next challenges the trial court's denial of his motion for summary judgment. It is an established rule in Illinois that where a motion for summary judgment is improperly denied, the error is not reversible for the result becomes merged in the subsequent trial. (*Home Indemnity Co. v. Reynolds & Co.* (1962), 38 Ill. App. 2d 358, 187 N.E.2d 274.) Consequently, even where evidence indicates that the motion for summary judgment should have been granted the error cannot be reviewed. (*Home Indemnity Co.*, 38 Ill. App. 2d 358, 187 N.E.2d 274.) As such, we need not address the merits of this issue.

In his post-trial motion, the plaintiff unsuccessfully sought recovery of attorney fees and expenses pursuant to section 2—611.1 or, alternatively, section 2—611 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, pars. 2—611, 2—611.1). These provisions provide for the recovery of attorney fees and reasonable expenses where a party makes false statements without reasonable cause (Ill. Rev. Stat. 1985, ch. 110, pars. 2—611, 2—611.1).

The plaintiff asserts the defendant made certain denials without reasonable cause and subsequently found to be untrue during the course of the proceedings. Plaintiff additionally sought recovery of attorney fees and expenses in the predecessor to this case (No. 82—L—615), which was voluntarily dismissed by the plaintiff on the eve of trial when the trial court disqualified the plaintiff's expert witnesses. The plaintiff maintained recovery for the expenses incurred therein should be permitted because they were necessarily involved in the second case (*i.e.*, discovery depositions and expenses related to witnesses from first case were filed in the second case).

■■ The purpose underlying statutory provisions for assessing attorney fees against parties making allegations without reasonable cause later found to be untrue is to discourage frivolous law suits and prohibit litigation without legal foundation. (*Peoples Gas Light & Coke Co. v. Black Steer Provision Co.* (1985), 131 Ill. App. 3d 387, 475 N.E.2d 1012.) The provision is not intended to penalize an attorney or a client for an honest mistake. *Peoples Gas Light & Coke*, 131 Ill. App. 3d 387, 475 N.E.2d 1012.

■■ ■ The allowance of attorney fees is a discretionary matter for the trial court. (*Brandenberry Park East Apartments v. Zale* (1978), 63 Ill. App. 3d 253, 379 N.E.2d 674.) The trial court, however, may only exercise such discretion and award attorney fees when the record discloses evidence of bad faith on the part of the pleader (*Dudanas v. Plate* (1976), 44 Ill. App. 3d 901, 358 N.E.2d 1171). Upon review, the denial of a motion for fees and costs for improper pleading will not be disturbed unless there is a clear showing that the dis-

cretion of the trial court was abused. (*Williams v. City of Chicago* (1977), 54 Ill. App. 3d 974, 370 N.E.2d 119.) The trial court herein found insufficient evidence to support the assessment of attorney fees. We find no abuse of discretion.

During trial, plaintiff presented Dr. Philip Norman, who testified regarding the cost of dentures. When asked, "What would your fees have been?" the doctor replied, "I probably would have charged him a thousand dollars." The doctor was then asked:

> "For this type of patient for the fee of approximately $1,000 for the condition that you saw him in at that time, do you have an opinion to a reasonable degree of dental probability if that would be within the range of usual and customary fees?"

To which the doctor replied:

> "It would be for me. That is what I would charge because *** ."

At this time defense tendered an objection to the answer of the doctor which was sustained. On cross-examination, Dr. Norman explained that he was unfamiliar with the charges of other dentists. He stated that dentists did not discuss fees amongst themselves in the dental association due to antitrust and price fixing laws. Therefore, Dr. Norman claimed he had no idea of what was usual and customary to charge for dentures. At the close of Dr. Norman's testimony, the defendants moved to strike all evidence regarding the cost of dentures. The court allowed the defendant's motion.

■■ The plaintiff maintains that this ruling requires an expert witness to violate Federal and State antitrust laws in order to testify about customary charges within the profession. However, these statutory provisions prohibit contracts, combinations, and conspiracies for the purpose, or with the effect, of restraining trade or fixing prices. Although professionals are prohibited from engaging in price fixing or restraint of trade, this does not prohibit them from being familiar with reasonable and customary charges for services tendered in the relevant professional community. In order to receive damages for services reasonably certain to be received in the future, there must be sufficient evidence regarding the customary charges of those services. The testimony of Dr. Norman, who had no familiarity with customary charges, was properly excluded.

During trial, the plaintiff testified as to his appointments with Dr. James, his general dentist. In discussing the treatment programs provided by Dr. James, the plaintiff attempted to testify to the content of his conversations with the doctor. The court disallowed the evidence on hearsay grounds. The plaintiff maintains this testimony was admis-

sible to establish the effects of Dr. James' statements upon him.

Hearsay evidence is testimony in court of a statement made out of court which is offered to show the truth of the matter asserted therein. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.) All hearsay is inadmissible unless it qualifies under an exception to the hearsay rule. (*Carpenter*, 28 Ill. 2d 116, 190 N.E.2d 738.) The testimony sought to be introduced by plaintiff was offered for the truth of the matter asserted. The plaintiff was suing the defendants on a theory that he had not been adequately informed of all reasonable alternative treatments prior to undergoing the extraction of his teeth. The intent of plaintiff in introducing his conversations with Dr. James was clear. Plaintiff hoped to establish that Dr. James failed to offer reasonable treatment alternatives and Dr. Goldwasser, who concurred in this recommendation, breached his duty in that regard. The testimony did not reflect the state of mind of the plaintiff. Additionally, Dr. James was present in court and testified as to his diagnosis and treatment procedure. As such, plaintiff's argument is without merit.

In conclusion, we find the cumulative errors committed during trial warrant reversal. The jury should have been instructed regarding the proper use of evidence of the plaintiff's past conduct, that being to assess the amount of damage sustained. The counts alleging wilful and wanton misconduct and battery for the unauthorized removal of the five lower teeth were supported by the evidence and, thus, were improperly dismissed. The trial court properly directed a verdict on liability for removal of the five teeth.

Upon remand, if the plaintiff elects to proceed on a theory of wilful and wanton misconduct or battery for removal of the five teeth, the issue of liability must be redetermined. Alternatively, should plaintiff choose to stand on the trial court's ruling of negligence for removal of the five teeth, the issues on remand should be restricted to damages for the five teeth and liability and damages for the 14 teeth.

Based upon our disposition of this matter, we see no need to address the cross-appeal issues. The cause is reversed and remanded to the circuit court of Champaign County.

Reversed and remanded.

KNECHT and SPITZ, JJ., concur.